Counsel for the appellant, are you here to tell us you've settled the case? Unfortunately, Your Honor, we have not. Please introduce yourself for the record. Pleased to report, I'm John Holmes, appearing on behalf of Appellant Nowcom Corporation. We will continue to work on that, however, Your Honor. Or that you would just love to go to use our mediation? You know, we've gotten this far with your mediator. Oh, you have? Yes, and so he's still working with us. All right. But you still feel that you need to submit at this point, or at least to pursue the case until there is a settlement? We had actually made a motion to continue this argument until later in the week to give us a few more days to work it out, which was denied. True. So we're here at the Court's pleasure. We thought we'd just give you a little bit of an incentive to maybe work later into the night or something. We're close, Your Honor. All right. Very well. Maybe you'll be closer after you hear our argument. You just never know. Let me begin. We brought this appeal on a very narrow part of the District Court's preliminary injunction. This concerns solely the sponsored links, the Google AdWord campaign. And as part of that, we believe the District Court erred in deciding that the descriptive terms at issue have secondary meaning. There was no direct evidence of that, and frankly, beyond the fact that they were used invisibly in the Internet search, paid search function, they weren't copied either, so to speak, because they weren't visible to anybody. They were pretty important to you, apparently, because you not only – I mean, I realize you're only appealing one prong of the three-part injunction, but I don't know why the District Court or we can't consider the entire course of conduct, which includes the domain name registration, it includes the keyword advertising, and it includes, you know, keyword stuffing. And you look at all that stuff and you say, gee whiz, this wasn't an accident. It was intentional use of the trade name. And that must be for some purpose. It wasn't just for fun. You're absolutely right, Your Honor. It was for a purpose. It was for the purpose of getting NowCom and its products noticed, not to confuse people into thinking that NowCom was Finance Express. And so while – whether it's proper or not for the District Court to – Yeah, but if that's true, then that is just squarely within initial confusion concept that this Court has embraced twice. Well, but I don't think you get there until you decide whether these descriptive terms have secondary meaning. And all of the cases to date have indicated, except for audio fidelity, that something more than mere copying is required. You have to have some indication that not the defendant thinks that there's a secondary meaning. Why aren't all of the things that I just mentioned that extra plus? Because they're all activities by the defendant. What's required – what the secondary meaning requirement focuses on is the mindset of the consumer, what the consumer associates. Yeah, but here's the point. By the time you have gone to all this trouble to free ride off of the trademark, can't you – can't the District Court infer that there is a probability of success on the merits, which is all we're asking here? We're not asking anything other than a preliminary injunction standard. Why couldn't the District Court for that purpose infer that consumers appreciate that the mark is associated with Federal – with Finance Express? Well, the preliminary injunction has to protect something. And in order to decide to protect something, you have to first decide whether it's protectable. And so the District Court needs to reach first the question of secondary meaning, and then it can get the probability of success on the merits. So whether or not there's secondary meaning is the question. There was a question of probability of success on that issue. Well, I'm not sure that Finance Express would be entitled to get to that analysis without first showing that there was a secondary meaning. In any event – That show that they're likely to show that there was. Well, I think they need to show that it's a protectable mark first, and then they can get to whether or not they are likely to succeed on the merits. But in any event, the secondary meaning is not established here because it's based solely on copying. In the circumstances of this case, where there's a group of customers in play because one company is essentially going out of business and various companies are competing for that business, Mannheim's going out of the DMS business by selling its customers to Finance Express, essentially, all Nowcombe was trying to do was get noticed. And that Nowcombe believed that these people who already know about Finance Express might come across it when it uses the Google AdWords the way it did, the intent was not to use it. Which is secondary meaning. Well, no, I disagree that it's secondary meaning. If I'm a subscriber of Newsweek, I know that – I'm not using the question of secondary meaning with the question of likelihood of confusion. Whether the mark has secondary meaning, there is evidence in the record that when Mannheim was using those marks, Tracker and Tracker DMS, that they were associated with Mannheim and when Finance Express acquired that, that would be the – that would associate them with Finance Express. So it's not a question of you're – you know, you just wanted to get noticed. That doesn't answer the secondary meaning question that you were really intending to confuse. Well, I was attempting – I'm sorry. I was attempting to address the question, you know, don't all of Nowcombe's activities demonstrate secondary meaning? And I don't think they do. In the context where you're dealing with somebody who's in the industry, Nowcombe, you need to know what's in the mind of the consumer to establish secondary meaning, and there's simply no evidence of that. Also, this case doesn't – the narrow portion of the district court's order that we're appealing doesn't meet the requirements for a use because the marks were never displayed in Google AdWord campaign. Right, but the language in the statute is use or display. So why were – these marks were used in the process of purchasing the ad – you know, getting the ad comments, getting the results on the sponsored links on the screen. Well, not in the sense used in, for example, Merck versus Metaplan, where they had to be visibly displayed on packaging or literature associated with a product or used to indicate source. Here the terms as, you know, keyed words are invisible to anybody doing the search, so there's no indication in Nowcombe's sponsored link as to source other than Nowcombe. Well, put that in the context of the Brookfield case. I'll try to figure out your answer. That is the key, I think, to your case, is can you distinguish Brookfield? Well, Brookfield is different because in that case we're talking about a URL. It's the thing you see. It's the thing you click on to go to. And in that case the two companies wanted to use the same URL. And we're not appealing the part of this case that deals with the URLs. We're just appealing the part that enjoys the use of keyed advertising or sponsored links. And so in this case, if you look at our sponsored link, it gives our product name. It's not Finance Express's name. And it gives a URL that's www.nowcombe.com. And there's no use of any of Finance Express's alleged marks on that sponsored link. And it's under the heading sponsored. And so I think it takes it out of Brookfield. In fact ---- It puts it pretty much in Playboy. I'm not sure that's true either, Your Honor. I think it puts this in the exception recognized by Playboy. In Playboy you were dealing with unlabeled sponsored links whose source was unclear. And the Playboy court said that it would be a different matter if the sponsored link was clearly indicated. And, in fact, at page 1062, the Brookfield court kind of foresees this situation also and says that this might be different. And this is different. The thing about Brookfield, respectfully, is that after deciding that if two links are displayed simultaneously, there shouldn't be confusion, they go on to say that there might be initial interest confusion anyways. But I think that ignores the reasonably prudent consumer test for likelihood of confusion because, you know, this is a situation where the search is basically costless. It's not like getting off at Exit 7 and having to get back on the freeway and drive away to find what you're really looking for. They're displayed simultaneously in the same spot. And, frankly, now comes sponsored link or analogizing to a billboard. It doesn't say come off this exit here and find Finance Express. It says this is the exit where NOWCOM is. And on the same page, Finance Express's billboard, if you will, says come off at this exit to find Finance Express. Those are both true statements. There's no misleading sort of deception there, leading people off the wrong exit, if you will. And with respect to Playboy, that cart acknowledges that there's a big difference between hijacking a customer by making him think he's going to one site when he's really going to another and just offering him a choice, which is what was done here. Both sites were displayed simultaneously, the links to the site. And this is... You're talking about the typical Google search. You put in one name, and you end up with the left side, which includes that name and related names, and then the right side lists, I guess, it's headlined sponsored links. Correct. All right. And so the sponsored link tells you that this is something different than the organic search results. Is a reasonable auto dealer, consumer, are they aware of what sponsored links means? Is there any evidence of that? Well, let's start... I mean, in the context of the consumers of these products, these are computer-based products, so I think it's not much of a stretch to assume that they know the difference between an organic search and a sponsored link. Anybody who spends a little time searching around the Internet will quickly figure out that, in general, you don't want to go to the sponsored links because they're not what you're looking for anyway. Well, sponsored links typically include a direct competitor, or they typically include people who are licensed to, or, in fact, sell the product  Well, a sponsored search will often have a relationship to the organic search results, and there's nothing nefarious about that. For example, one of the AdWords that NowComm purchased was dealer management software. If someone had searched for dealer management software, NowComm might turn up in the organic search results as well as the sponsored search results, and Finance Express might be in the organic results. But Federal Express or Tracker wouldn't. Finance Express? They might. You know, if you search for dealer management software, for all we know, Finance Express bought those AdWords, too, and where you appear in the Well, I understand that, but, I mean, if you, instead of inputting dealer management software or something, you input Tracker or you input Finance Express, I mean, you're going to get Finance Express. I would assume that you would always get Finance Express in the organic search results. Yeah, I would assume so. And then you show up as a direct competitor in the sponsored link because you've You've paid people to display your ad when somebody searches for Finance Express. That's functionally what you've done. It's kind of no different It does create, at least initially, confusion. But not in this circumstance. Why? Unlike Playboy, where the sponsored links are unlabeled and based on the nature of the links, it looks like, hey, that might be Playboy. Here, our sponsored link gives our product name, not Finance Express's product name, and it gives our name. And there's no mention of Finance Express. Why is it reasonable for the district court to have supposed that a user seeing the sponsored link over there would assume that it has a relationship with Finance Express? Because that's what sponsored links normally have, some kind of relationship. They either have the product or they're authorized or they're a franchisee or something like that. So why isn't that kind of a reasonable assumption on a preliminary injunction? I disagree that sponsored links have that kind of relationship. They're not necessarily related to the trademark holder any more than seeing the generic brand on the supermarket shelf means that it's somehow related to the brand name product. All this is is a way of getting alternatives in front of consumers so they can make choices. It doesn't mean that we're trying to fool people into thinking we're Finance Express. In fact, in this circumstance, Nowcombe believed its product was cheaper and better and easier to operate. It didn't want people to think it was Finance Express. As you know from the briefs and the records, Finance Express had heard about ñ I'm sorry, Nowcombe had heard about Finance Express acquiring the Mannheim product at trade shows in which people were complaining to it. They didn't want to go to Finance Express. It was very expensive and it was different in nature. And so Nowcombe didn't want people to think it was Finance Express. It wanted people to know it was out there and different than Finance Express. Counselor, is there any prohibition or restriction that you're aware of against having sponsored links which are direct competitors of the organic search results people?  In other words, if you put in Finance Express in a Google search, is there any prohibition against Nowcombe's eligibility to be a sponsored link? I'm not sure whether you mean a legal prohibition or a Google link. Of any kind, either restrictive in a copyright sense or in any other commercial sense. I'm not aware of any here. All right. The reason I ask the question is if I'm making reservations on Expedia, for example, and I go through Google, it'll take me to Expedia as the first organic result. But I'm very much aware on the other side that it lists about a half a dozen competitive sites to Expedia. And I'm wondering, is that typical or is that unusual? I don't think it's unusual, Your Honor. Isn't that the whole purpose of Adcom? Excuse me? Google's Adcom, that's the whole purpose of Adcom, is that it enables competitors to buy space on the screen, it's really on the screen when a particular competitor or subject related to their business is input into the organic search. That's correct. The whole business of Adcom is that, right? Right. That's what Google has the AdWords for is so that people can take advantage of that. It's not unlike Budweiser saying to the broadcaster of the Super Bowl, I want my horses, my Clydesdales, right after the Coors commercial. If I input Budweiser into a Google search, am I very likely to produce Miller's as a sponsored link? Your Honor, I've never searched for Budweiser, so I don't know the answer to that. Maybe I get Clydesdales, but I don't know about Miller's. And it's also not unlike Burger King going to Viacom and saying, you know, whenever McDonald's rents a billboard from you, I want to rent the next one down the highway that's available. And there's nothing wrong with that. Right. Thank you, Counsel. Your time has expired. Thank you very much. Thank you, Your Honor. I apologize. I see that I did go over. That's okay. Our questions took you over. Finance Express. Good morning, Your Honors. Jeremy Rosen of Hurvitz & Evey for the appellee. I'd like to start, if I may, with the last series of questions begun by Judge O'Scanlan about whether there's any prohibition about having a competitor come up in a Google AdWords search. And the answer to that is no, if the reason they've come up in that search is because of use of keywords that are not tied to the plaintiff's trademark. The reason we are here is not because the defendants used common keywords, such as, you know, auto dealerships or financing, to lead to their placement in the sponsored link. The reason we're here is that the defendants deliberately and intentionally used our trademarks. All right. We'll go back to my question. I told you about the Expedia search. And on the right-hand column under the sponsored links, it says easytickets.com. Get cheaper flights on easytickets.com. Are they violating some prohibition? Well, it depends how it arrived there. If the easy tickets arrived there because someone was searching for travel, like using just putting in Google keywords like travel or buying tickets. No, so they put in Expedia. And as a sponsored link, cheaptickets.com says I want to be there every time somebody looks for Expedia because I want to offer that possibility. That possibility is a choice. Well, that would be the same as this case and the same as Brookfield and Playboy, and that would be a trademark violation because. But it's not Brookfield. Brookfield wasn't a Google search. True. The URL case, was it not? It has two meanings. And the problem with Brookfield is that you put in the keyword, and you did confuse the consumer because what came up was the webpage for the competitor, but not something that had the original search on one side, and now here's some other people who are selling a similar or same product. Two points to make to that. First, you're correct that Brookfield, of course, is slightly different factually in that it was the URL name. But in the analysis of why the use of the URL name, this court in Brookfield said that a consumer who was originally looking for Brookfield's products or services may be content with West Coast site, but they reached West Coast sites because of its use of Brookfield's mark, which is exactly what's happened here. The reason that the Nowcom site came up was because of their use of their mark. So the consumer may ultimately be satisfied once they get to Nowcom's website, but the only reason Nowcom's website came up in this particular Google search was because of the use of our trademark. Now, Playboy, I think, is very directly on point because what happened in Playboy, of course, is the tying the use of keywords typed into Google leads to pop-up ads, and that is more or less what happened here. Instead of a pop-up ad, you have a sponsor. That's one of the areas that the district court seemed to be confused about is he thought these were banner advertisements. He seemed to not understand the distinction between the sponsored links and the banner advertisements, which are more analogous to the pop-up sites. Well, I think that the sponsored link is that they work functionally the same way. A sponsored link comes up because it's tied to a particular keyword in the same way that the banner advertisement in Playboy came up because it was tied to a particular keyword. And then the question under Playboy and Brookfield as well is, is there a risk of initial interest confusion? And the district court here made specific factual findings on a preliminary injunction record where, to reverse, this court would have to find are clearly erroneous. And what the district court found was that there is a risk that a reasonable consumer, when typing in Tracker or Finance Express or whatever our mark, clearly looking for our company, that when they see the sponsored link, and, of course, NowCom, they don't know NowCom might be affiliated with us. It's not necessarily clear that a sponsored link is a competitor. In fact, the McCarthy Treatise on Trademarks, as we cited in our papers, indicates that there have been studies that demonstrate that 60 percent of consumers don't realize that competitors pay for the sponsored link. And in any event, it's not unreasonable for the district court to have presumed that some, particularly on a preliminary injunction motion, that some consumers would be confused. And the district court went beyond that and analyzed the NowCom sponsored ad and made factual findings that the heading of the ad, which was a much larger font size, just talks about general dealerships and that it doesn't, until you get to the fourth line, mention NowCom without any indication that NowCom is a competitor or without any indication that NowCom is. Okay, the sine qua non of trademark liability is confusion. And I've looked at the screen, and I do not see how a reasonable consumer could be confused between, even keying in the word Finance Express, especially a sophisticated consumer, because, again, we're talking about people in this niche business. They put in Finance Express. The first thing that comes up on the results, the Google results, is Finance Express. And then you have a bunch of other people that are not using Finance Express as trademarks. They're not trying to portray themselves as Finance Express or purveying the same product, even. I don't see how a reasonable consumer would be confused. I mean, I know my 13-year-old would not be. Well, and your 13-year-old may not be a reasonable consumer because she is very precocious. No, that's not true. It's because all 13-year-olds use computers now. Well, just a couple of answers to that. The first is that, of course, I believe the screenshot you're referring to is the one that's included in the other side's briefs. You're right. I haven't done independent research. Well, no, but if you look at page 159 of the record to another Google screenshot of Manhattan Tracker, if you look on the left side, the organic search, you don't get to any of our sites. And on the right, you have only the same NowCom advertisement talking about managing your dealership. So this one is a lot more confusing because, of course, the Google screenshot, so that's just one screenshot in time. Because the 159 that you're talking about, the keywords that were entered were Manhattan Tracker. And the first thing that comes up is out-of-dealer software. Then the second thing is Marcus Manhattan Tracker, Manhattan Steamroller. Well, although this is not, though, our site, though. This is some forum discussion. And also the new com doesn't come up. Well, the NowCom comes up, the first thing on the right, under the sponsored link, which, of course, the sponsored link is in small type. But couldn't you have done the same thing that NowCom did and make a contract with Google to have a sponsored link? Well, if we did it using our mark, that would be completely lawful. But the question is whether a competitor can use our mark to at least draw some initial confusion. And just to get back to Judge Wardlaw's question, and I think perhaps answer yours as well, Judge O'Scanlan, that even if the consumer, and, of course, under the initial interest confusion test, it presupposes that the ultimate consumer, before any purchasing choice is made, fully understands that they are making now a different choice than the one they had initially intended in going to a competitor. But what Brookfield says and what Playboy confirms is that... What I'm challenging you to is, you know, the dissent, Judge Brisson's dissent in Playboy, says if you carry that to the logical extreme, you know, extending Brookfield and Playboy to the logical extreme, what you're going to get is trademark infringement because you went to Nacy's looking for Ralph Lauren and the Charter Club sign caught your eye first. Well, before I will address Judge Brisson's concurring, I guess it's technically a concurring... Oh, you're right, it's technically a concurring. But... It's a warning. Yes. I guess just sort of the broader threshold point to be made is that for this case, it just is a simple application of Playboy. There doesn't have to be the extension that Judge Brisson discusses in her concurring opinion. To the extent, though, that there is some concern on this panel that Judge Brisson's concerns are valid, of course, the only appropriate remedy is to take this case on bonk. It would not be for the panel to just... I don't think there's a direct conflict here. It's an extension, a further extension. They're not... They're talking about pop-ups in Playboy. They're talking about keyboarding where the consumer never even sees the... They might know the trademark or they might be looking for something. They're not... Never has the opportunity to associate the trademark with your product. Well, that comes back down to, though, the question of the standard of review and the factual findings made by the district court. The district court made a factual finding that there was, at least with some consumers, a risk of initial interest confusion because they would not necessarily know that a sponsored link was a competitor in a different... in a completely different product. All they know is that they typed in either Mannheim Tracker or Finance Express or whatever, whichever one of our specific trademarks, intending, obviously, to look for our site. And what comes up, based upon the use of our trademark, is a direct competitor. And it's the same... Even if they click on the direct competitor, they know they're clicking on Newcom and not Finance Express. But that assumes that they know that Nowcom is somehow not affiliated with Finance Express, and that goes back to the district court's factual finding here, that the reason that there is a potential or potential likelihood of success on the merits is that there is the risk of an initial interest confusion of the consumer not realizing that Nowcom is somehow a competitor. And to take the language from Playboy, the question is, was it clearly labeled? And here, the district court made specific factual findings that it was not clearly labeled because it did... because the font size was different when you get to Nowcom. It wasn't clear that Nowcom is somehow unaffiliated with Finance Express. I mean, here you have a situation where you have Finance Express buying up other companies. A consumer may have had the reasonable expectation that, oh, I typed in Finance Express and I get Nowcom. That must be another one of the Finance Express companies. It wouldn't be until they actually click onto Nowcom and potentially work their way through the Nowcom website where they might then realize, oh, this is actually a different product and a different competitor, but that is exactly what Brookfield and Playboy are talking about in terms of the initial interest confusion. Well, I think your whole argument depends on whether or not the reasonable consumer would understand that the responses to the keyword inquiry on the original Google responses are what they were searching for and understand what a sponsored link is. A sponsored link is something that anybody can buy from Google. And as McCarthy on trademark cites to a study, 60% of consumers don't know that. And while my son may realize that and other technologically savvy people may realize that, the question, and as this court stated in the GoTo versus Disney case, the question, you don't look to the smart consumer, you look to the... Well, here we're talking about a fairly sophisticated consumer. Let me ask you about that state. When was it done? 2002. See, that's the other problem in this area is that the technology keeps changing so fast and the consumers are becoming so much more sophisticated. I remember when we got together and wrote Brookfield and I was on the panel. You were on the panel. Right. And it was... I mean, I don't know if we... I mean, Google, I don't even think it had even gone public yet. I mean, it wasn't widely known. I'm just... That was... Was that 99? Yeah. That was 10 years ago. Well, I think it's true that technology is changing. I guess the question, though, on an appeal from the grant of a preliminary injunction, the question is are the district court's factual findings clearly erroneous in that is it clearly erroneous for the district court to have found a potential for a likelihood of success on the merits and the district court made specific factual findings that there was confusion. Now, to circle back, I think we got sidetracked from discussing Judge Berzon's concerns in her concurrence in Playboy. I think that is in part answered by Brookfield and other cases from this court that talk about that the Internet is much more likely to spawn confusion than a pure brick-and-mortar store. When you go into a brick-and-mortar store and you see the products side-by-side, you can look at everything at the same time, you know what you're looking at. When you have websites where you don't know what NowCom necessarily is, you know you typed in Finance Express and you got NowCom, maybe they're related. There's just a lot more uncertainty on the Internet because you don't have all the information. You don't necessarily know what the information is reliable. There's a lot more potential for confusion. And that's, you know, in Brookfield and I think in the GoTo versus Disney case, this court emphasized the point that the Internet is a particular area where there's a larger risk of consumer confusion. And again, that goes back to the appropriate standard of review here. The district court, taking all of that into account, and I think taking into account the increasing risk of confusion on the Internet, made the specific factual findings that there at least was a possibility of probability of success on the initial interest confusion based upon the facts of this case. And I think the Flayboy case and the Brookfield compel with particular results in this case to affirm the preliminary injunction.  Thank you, counsel. Thank you. The case just argued will be submitted for decision. And the Court will adjourn.
judges: O'scannlain, Rymer, Wardlaw